Good morning, your honors. May it please the court, Kristen Moncel for petitioners. I'd like to reserve four minutes for rebuttal. In this case, petitioners seek review of a Clean Water Act permit known as the National Pollutant Discharge Elimination System or NPDES permit for offshore oil and gas facilities in federal waters in the western and central Gulf of Mexico. And I know your honors are interested in discussing our standing to bring this case, which I will address in a moment. But first, I wanted to provide some more context for the case, which I think helps underscore why we do have standing here. The permit issued by EPA allows oil and gas facilities to discharge an unlimited amount of chemical-laden waste fluid, including chemicals used in offshore fracking and acidizing, without adequately studying the potential impacts on the marine environment. And this is a problem for several different reasons. EPA allowed these discharges despite record evidence showing fracking has substantially increased and may have harmful impacts, despite admitting it doesn't know what chemicals are currently being used in fracking or the composition of the waste fluids and that it doesn't have any information regarding the impacts of fracking chemicals on the marine environment. And both the National Environmental Policy Act and the Clean Water Act prohibit such uninformed decision-making. And there are three components of the decision I'd like to focus on today as to why it was unlawful. First is that despite recognizing that the EPA failed to examine a reasonable range of alternatives to the discharges allowed under the permit, in fact, didn't really examine any at all. Second, it failed to take a hard look at the impacts of the discharges it was authorizing. And finally, issued an unreasonable evaluation under the ocean discharge criteria that relies on decades-old information without properly considering the impacts of the discharges and offshore fracking and acidizing chemicals in particular. But first, with respect to standing, as the Supreme Court articulated in Lujan and a slew of other cases, a plaintiff adequately demonstrates standing to bring a case when they demonstrate three things. One, an actual or threatened injury. Two, that that injury is caused by or fairly traceable to the actions of the defendants. And three, that it will be redressed by a favorable decision. And we've established all three of those components here. First, with respect to the injury in fact, the Supreme Court said in Friends of the Earth v. Laidlaw, which we cited in our briefs, that plaintiffs adequately allege an injury when they use the affected area and are persons for whom the aesthetic or recreational values of the area will be lessened by the challenged activity. Well to what, I mean is there no geographical limit on that? I think it depends on what the scope of the action is to some extent. Here you have a permit that applies to all offshore oil and gas platforms in the western Gulf of Mexico. We have members that use the Gulf of Mexico for recreational purposes. We have members who are interested in the wildlife that swim throughout the Gulf of Mexico onto the coastal areas. And in fact, this court in Gulf Restoration Network v. Salazar, which also involved the Gulf of Mexico, found that some of the same petitioners here had standing to challenge the approval of these activities without adequate NEPA review. And they did so because the declarations that were submitted described recreational and aesthetic interests in the Gulf and the surrounding areas, including the wildlife and coastal beaches therein. The court also found causation and redress was satisfied because the case arose under NEPA, which is a procedural statute which lessens the bar for establishing causation and redress. And to establish these you only need to show that it's possible the procedural remedy will redress the injuries, which you do by showing the procedures at issue are designed to protect some threatened and concrete interests. Has the Supreme Court approved that theory about procedural standing? I believe they have, Your Honor. I think in the Summers case that was a case that arose under a procedural violation. And while standing was ultimately found lacking there, the court did recognize that a plaintiff who uses the area at issue can establish injury and that can be redressed by additional procedures that are intended to protect those. Well, I don't want you to spend all your time on this, but I do have one. I mean, back to this geographical thing, you know, the Gulf of Mexico is how many, you know, it's probably a million square miles. And could someone who lives on the coast of Florida object to an offshore permit that was issued, if it were ever issued, for drilling off of Boston? Because after all, it's the Atlantic Ocean and after all, I, you know, I go fishing in Florida and so on. I mean, I think so, Your Honor, because there are species who migrate up and down the Atlantic Coast. For example, North Atlantic right whales, they migrate all the way from Florida up to Canada. So the first, so they could credibly argue that the, I mean, and again, I'm not going to waste your time about this. But are you challenging the reissuance of the permit that has continued authorization of drilling for, you know, whatever many wells are in the Gulf for the last 25 years? Or are you challenging the incremental requirement to, for an EIS for the new sales? We're challenging the issuance of the permit by EPA. Which includes, if we were to, I mean, potentially what you were saying is we would shut down all the drilling, all the production in the Gulf of Mexico. Is that right? No, Your Honor, because this permit, the permit at issue here only applies to the discharges from offshore oil and gas facilities. And our arguments stem from the fact that in order to allow the discharges, EPA needs to first adequately study the impacts under both NEPA and the Clean Water Act. The leasing is a separate issue that's done by the Bureau of Ocean Energy Management under the Outer Continental Shelf Lands Act. This is an action taken by EPA under the Clean Water Act. And I think the distinction is important because the OCSLA statute is one that seeks to promote the development of offshore oil and gas resources. Yeah, but you're going beyond, your challenge goes beyond that, right? We're not challenging that in this case at all. What we're challenging is the permit But the permit issue, this is what I, I'm sorry. The permit issued by EPA covered both existing drilling activities and those contemplated for the next five years in the lease program, right? Not necessarily. So the permit covers new and existing discharges. So it covers all the facilities that are out in the Gulf of Mexico right now discharging wastewater, fracking chemicals, et cetera, into the Western Gulf. It will also apply to any new source that applies for application under the general permit over the five years life of the permit, which would include leases that have already been sales. So the way it works is there's a lease sale, then exploration activities, then develop activities. So you could have a lease that occurred several years ago, but a new source is only now going in pursuant to an old lease. And so our case would apply only to the discharges from those facilities because it's the Clean Water Act permit issued by EPA that's at issue here. Do I understand correctly your theory of standing from a geographic standpoint is the Gulf Coast? No, I think it's two. Do you have declarations that are more specific than that? Yeah, so I think the declaration from Henderson, Jonathan Henderson, is instructive on this. I think we have sort of two reasons why we're injured. One is that we have members who go out into the Gulf. Mr. Henderson... So that's the scope of the geographic area? Yeah, the Western Gulf of Mexico, primarily waters off Texas and Louisiana. That's a pretty broad category. What's your best case? I think you mentioned Friends of the Earth. Yeah, Friends of the Earth. The Gulf Restoration Network case is another one. That is the same couple of plaintiffs here. Well, why don't we talk about that case because I think Friends of the Earth is much more  If I recall, it's a 15-mile area or a 5-mile area. It's very specific. It was a little bit broader than that in that there were members that recreated 40 miles away from the facility and wanted... Right, but as long as you have a member or at least some number of members that are more specific, the fact that you have other members that are broader is beside the point, right? Fair, yeah. So let's talk about Gulf restoration because I take your point that the language of our opinion certainly seems potentially broad, but you mentioned the declarations in Gulf restoration. Have you had a chance to look at the declarations in that case? In that case, we have some of the same declarants that we used in that case that are in this case as well. Because the declarations in those cases, I'm glad you've had a chance to look at it because I don't want to be unfair to you. The declarations in Gulf restoration are much more specific from what I can tell. There's a reference to a specific location, to a specific island. I confess I'm not all that fluent in the geography, but there's a reference to being interested in a particular end of the Mississippi River. I enjoy bird watching in Grand Isle, on the beach at Grand Isle. Isn't Gulf restoration as a factual matter far more specific? I mean, I don't think so. Some of our declarations here do mention specific areas. For example, Jonathan Henderson mentions that he goes out in boats and planes over the Mississippi Canyon, which is in the Henderson declaration on page three, paragraph six. But don't you need to connect whatever those injuries are to the particular conduct that you're challenging? Namely, the emission of the pollutants and the fracking materials from these particular sites? Yes, and I believe we've done that here. He goes out into the Gulf for various recreational activities by boat, by plane, and enjoys observing wildlife in the area and is concerned that the discharge of fracking chemicals and other waste water from offshore oil and gas facilities will harm both water quality in the Gulf and, for example, sea turtles, which swim throughout the Gulf. Which I understood was the basis of your answer to Judge Jones earlier about why someone in Florida could object to pollution in Boston. What I'm concerned about is the traceability prong. And with respect to traceability, I'm going to use the respondents' names because I realize there's multiple Friends of the Earth cases. The Intervenor cited a case that comes after Crown Point, and then it's called, I'm sorry, it comes after Cedar Point, which is called Crown Central Petroleum Corporation. And this may be the one that you were referring to earlier. So simply the fact that the pollution goes 18 miles down a river is insufficient to trace. Even if you have an injury, right, like you're concerned or you have a harm or whatever kind of environmental injury, it's not traceable because 18 miles is too far. And simply the surmise, as Judge Ingebotham put it in that opinion, that pollution flows downstream just like, for example, turtles migrate through the water or people go out into the Gulf is insufficient. Yeah, I think the distinction with the Crown Central case is that there the members recreated in water bodies that were three tributaries away from the point source of the discharge. And so it wasn't even clear that it was the same waterway. But now we're talking about the water patterns of 660 quadrillion gallons of water, which is in the Gulf of Mexico, right? So I mean, that seems way more speculative than trying to figure out how pollutants might move through three tributaries. I mean, there's no doubt, the opinion explains that the three tributaries all flow down into one and over an 18-mile stretch seems way easier to infer causation there than it would be as to how the point sources in this case. We don't even know where these point sources are, at least according to the declarations vis-a-vis the turtles and the other injuries. Yeah, I mean, the whole point of the permit here is to allow the discharges and to allow this pollution to occur into this water body. And while it is large, that doesn't mean that our standing declarants don't have a particularized injury in it. And I support that. Well, but again, but then you have the fact, which I think you dispute. But the fact that they say is that dispersal of whatever discharges occur effectively vanishes within 1,000 meters of wherever the discharge occurs. And so that means that, to me, that localizes in a giant body of water, that localizes the potential impact. And of course, when it means it disperses, that means that even the potential impact on migrating turtles or whatever it is, is going to be hard to track. And so if it's hard for the turtle who's swimming through it and presumably breathing it or whatever they do, then it's even harder, it seems to me, for the fisherman who's throwing a line down without knowing where those discharges are. Yeah, and I think that the important thing to remember in thinking about this is to not equate the merits with the standing inquiry. As the court instructed in the Laidlaw case, the Supreme Court, the focus is not on whether there's harm to the environment, but whether there's harm to plaintiffs. And here we have declarants who go out into the very same waterway that is going to be more polluted by this permit and have a particularized interest there. I'll give you five more minutes. Okay, for rebuttal or? No, you can speak now. Okay, great, thank you. So if your honors don't have any more questions on standing, I can move on. We'll withhold our questions. And I think one thing that's helpful, both with respect to the standing inquiry, but also with respect to the merits of this case, is the court's opinion in Louisiana v. Lee, the Fifth Circuit's opinion there, and that involved the dredging of a water body that had been dredged for over 50 years. And the court said that that didn't matter in analyzing the significance of the impacts because the idea that even a badly damaged body of water can restore itself to ecological health if the disruptive activity is halted and new sources of pollution may expand the area of damage. And now turning to NEPA, I think one thing that I wanted to focus on first is sort of this overarching argument that EPA puts forth is that, oh, because BOEM did this EIS on these five-year planned lease sales and we're taking an action that's related to that, we were a cooperating agency under that, then basically anything we do in the Gulf of Mexico related to oil and gas activity has already been analyzed under that EIS. And I don't, that's just incorrect. I think the purposes of the statute under which the agency is acting have to guide the agency in determining whether or not that NEPA analysis suffices for the new action. And it doesn't here because of the distinctions between the two statutory schemes. OXLA, the statute under which BOEM was, sorry, this is a lot of acronyms, the Bureau of Ocean Energy Management was acting, is one that promotes offshore oil and gas leasing. Well, let me just, wait, I mean, just let me stop you right there because this is not the first rodeo as regards permitting in the Gulf of Mexico. And it is well established that agencies can cooperate. That's the whole point of efficiency. And it's certainly true. The Fish and Wildlife has one mandate in reviewing. They probably had some input into this environmental impact statement. And EPA has another. And, you know, the Bureau of Land Management has another. So you can make that, your argument proves too much because these agencies always have different mandates. But that doesn't mean, in fact, the law allows them all to cooperate for the purposes of EIS. So you have to be far more specific, it seems to me, in saying why the purposes of EPA were thwarted by what they did here, which is facially perfectly okay. And, yeah, we're not suggesting that EPA needs to start from scratch by any means. You know, we recognize that the law does allow cooperating agencies to adopt other EISs, that that does lend itself to efficiency. But I think the Holy Cross Wilderness case from the 10th Circuit that we cited in our how this is supposed to work, there the plaintiffs challenged a dredge and fill permit from the Corps for a water development project in a wilderness area. The Forest Service had jurisdiction over the land and prepared an EIS, which the Corps adopted as a cooperating agency in the EIS. But then in issuing its record of decision for issuing the Clean Water Act permit, the statutory schemes under which the agencies were acting are recognized as having Well, what's the difference here? I mean, what I asked you, how was EPA's mandate, mission, whatever, thwarted because they adopted this EIS? Because they didn't consider the fact that the Clean Water Act is supposed to protect water quality. Its primary purpose is to prevent certain discharges are prevented. I mean, that is way too broad and general. What in this EIS, was the EIS, you had said no reasonable range of alternatives, no hard look at the science or whatever. Is that what you mean? Yes. Okay, fine, well then move on. Yeah, and I think the reason why I'm focusing on the purposes of the underlying statute is because numerous courts have said that what is a reasonable range of alternatives is guided by the underlying purposes of the statute that the agencies are acting under. And what alternatives were not, there were five alternatives listed in the adopted EIS, so what was, what other alternatives should there have been? So, for example, the agency should have considered alternatives that would have reduced the types or quantities of discharges that the permittees would be allowed to. The EIS doesn't actually do that. If you look at the document itself, it just, it restricts where and when leasing can occur, but doesn't specifically restrict the type of waste streams that can be discharged or the quantities that an individual permittee can restrict, such as Region 9 of EPA does. And I think Region 4 of EPA recognized this when it did a separate evaluation under NEPA in issuing its most recent Clean Water Act permit, which we included in our briefing. Okay, well, you have, we will not, you know, penalize your rebuttal, so thank you. Mr. Carson. David Carson on behalf of the Environmental Protection Agency. First with respect to standing, as the Court is aware, we didn't contest standing here, and we think the interveners have raised some very serious questions about the specificity necessary to allege sufficient harm for these activities. But since we haven't briefed it, I don't intend to address it this morning. We split our time, and Mr. Rosenbaum is going to address that. So I'll turn to the merits to the extent the Court decides to reach the merits. And I think it's important to consider the background that EPA was acting against here, Your Honors. The general permit here was not issued in a vacuum. In fact, EPA has been regulating these very types of discharges in the Gulf under general permits since 1982. There have been 12 previous general permits or reissued general permits for these sources in the Gulf since that time. Since the focus today is on produced water and well treatment fluids, that's where I'm going to concentrate my comments. It's not accurate to say that EPA doesn't regulate the types or quantities of discharge, because for several other categories of discharges, there are specific regulations, aren't there? That's correct, Your Honor. In fact, for well treatment fluids, they are prohibited from using any of the priority pollutants. There's a whole list of 126 of them. And a very, very important limit in this permit that's discussed in our brief is called whole effluent toxicity. And that is a limit that's contained in the permit here. It ensures that the aggregate toxic effects of all pollutants in the discharge produced water will have, quote, no observable adverse effect on aquatic organisms. And so regardless of what's in it, it cannot have, it must result in a no observable effect. That's the concentration. So it definitely takes into account the types of pollutants in that manner. And so in 1993, EPA issued its effluent limitation guidelines for the offshore oil and gas extraction activity. It had a great deal of information regarding the discharges that it looked at at that time. This included a study of produced water from 30 platforms in the Gulf of Mexico. The guidelines established standards. They're applied to the oil and gas sources in the Gulf through the permits like the ones we are at issue here. And this permit contains not only that whole effluent toxicity standard, which is probably the most key standard under the permit, but also specific limits for, other specific limits for produced water such as the oil and grease standard. Those standards also, actually also help to treat the well treatment fluids, which are normally discharged through produced water. And in addition, there's a, again, there's the prohibition on the discharges of priority pollutants in well treatment fluids. So EPA has been applying these same or similar limits to these types of sources under these types of general permits for many years now. And none of the information that it's gathered under any of those permits has shown that the discharges associated with them result in any unreasonable degradation to the marine environment. And that is the criterion that it applies under the Clean Water Act for these discharges. No unreasonable degradation. And that's the background from which EPA operated here, and it reasonably determined that there'll be no unreasonable degradation with this general permit, based upon the limitations contained in it. Real quickly, I also want to mention, since petitioners focus so much on hydraulic fracturing, I want to talk a little bit about the difference between what's done in the Gulf than what's done onshore. Because when you look at their comments, you look at their brief, they seem to want to equate fracking in the Gulf with fracking, and I'll just refer to hydraulic fracturing shorthand like most people do by fracking, by fracking onshore. And it's a whole different animal. Onshore fracking can involve millions of gallons of fluids, including water, into very deep hydrocarbon formations where you've got really tight shale formations, where you need to go in there and break it up. In the Gulf, it's entirely different. These are sand formations. This type of hydraulic fracturing simply isn't necessary there. What they use is what's called fracked packs. This is discussed in the EIS. If you look at the bait stamping, it's GMG in our record. If you look at GMG 178 through 181, that's where it speaks to this. Specifically notes. Can we talk about a slightly different distinction? In your brief, you have this map of the Gulf, and there's a dotted line between EPA Region 6, which seems to be the central and western portions of the Gulf, and EPA Region 4, which is the eastern section of the Gulf. Are these sorts of decisions about how to do the EIS, how to issue these sorts of permits, are these done by the regional administrators of the two regions, or are they done by EPA and D.C.? They're done by the regions, Your Honor. That's the reason it's set up that way. Is that why there's slightly different considerations that go into the permit calculus from one half of the Gulf to the other? Yes. In the part of the Gulf that's under EPA Region 6's bailiwick, if you will, there's just a lot more sources, too. My understanding is there's much less activity under Region 4. But EPA in Washington is not controlling the standards that the regional administrators apply to their permitting processes? I think there's a fair amount of coordination, Your Honor, but these are regional decisions is my understanding. So going back to hydraulic fracturing, the amounts and concentrations of chemicals are far less than onshore fracking. There's only a few thousand gallons of fluid, and the depths beyond the wellbore are only like 49 to 98 feet. And it is to increase the flow in the vicinity of the wellbore, but another key purpose is, and this is discussed both in the Ethnolimitation Guidelines Development Document and the EIS, that they use gravel packs in these types of operations to prevent sand infiltration into the wellbore. So that's part of what they're doing with frack packs. So while fracking in the form of frack packing does occur in the Gulf, it is simply not the major water quality issues that petitioners try to make it out to be. And again, to the extent that it is being used, the fluids are subject to the limitations on produced water when it's discharged into produced water or the limitations for well treatment fluids. And I would also note that the General Permit has a zero discharge limit for produced sand. Produced sand would include any slurried particles used in frack packing. That's discussed at GMG 4314. So any chemicals that might be bound up in produced sand may not be discharged under the General Permit. So it's effectively regulated under the General Permit. I'd now like to turn to the NEPA question of, you know, there's a suggestion here that EPA just didn't really, just completely, didn't look at water quality impacts, just turned everything over to BOEM, and didn't really do an analysis. And I think that's just totally belied by EPA's record of decision under NEPA, which is at around GMG 3079. It shows that EPA conducted an independent review of the EIS and determined that it adequately assesses and discloses the environmental impacts of EPA's reissuance of the General Permit. EPA's NEPA record of decision specifically referenced the environmental impact section's discussion of the limits to be imposed under the General Permits as necessary to meet the ocean discharge criteria under the Clean Water Act. And EPA specifically agreed with the conclusion that the impacts to water quality were expected to be negligible, in part due to those limitations. I suppose if EPA could even have found a, what is it, a declaration and environmental assessment instead of an EIS, I suppose. I don't know. I think in the past when they've done it, when EPA has done the NEPA analysis on its own, my understanding is that it has done an EIS, and I haven't really looked at the question of whether they could have done an EA instead. But they certainly, I mean, when you, I think you do have to consider the extent of mitigation. You know, under NEPA you can consider the extent of mitigation in your analysis of impacts and in your analysis of alternatives. And here I think that's the key thing to consider is, and that's what I was just getting to in the rod, I mean, EPA noted that section of the environmental impact statement which specifically references EPA's obligation under the Clean Water Act to ensure that there's no unreasonable degradation of the marine environment through this general permit. And there's some discussion of that in the rod. EPA referred to it in its, rather there's some discussion of that in the EIS, and EPA specifically referred to that when it was discussing its conclusion that the impacts had been adequately addressed. EPA's record of decision also specifically incorporated by reference its draft NPDES permit. You know, these two processes were going somewhat in tandem. And its fact sheet and supplemental information for the general permit. So EPA fully considered the fact that it was mitigating, as it is required to do under the ocean discharge criteria, these types of impacts. It very much considered the water quality impacts. And EPA's independent review is certainly sufficient for a cooperating agency under the CEQ's regulations, which say that a cooperating agency may adopt an EIS if the EIS is adequate. And I think all of this shows, and all of our arguments in our brief show, that this environmental impact statement was adequate. One thing I would point out on, this was kind of brought up to some extent in the discussion of the no-action alternative, and I would just point the court to, for the no-action alternative, page GMG 461, there's a chart that specifically shows that there will be no new discharges would occur under a canceled lease sale. But one thing, since you, Judge Jones, you ask about existing operators, existing operators would be allowed to continue to discharge under, the existing permit would be administratively continued, effectively, under EPA's regulations, which incorporate that requirement from the APA. So from their briefs, it appeared that they were suggesting some kind of challenge to existing permit holders, and I wasn't clear about that. Yeah, it was a little unclear to me exactly what point they were making, but I think they were trying to suggest that the EIS didn't adequately consider the fact that EPA's permit covers existing discharges. And I would point you to, in the, at GMG 19, the EIS specifically states that activities related to previously issued leases and permits related to the all-continental shelf oil and gas program would continue. There's a parenthetical in there about future things and separate decisions, but it fully disclosed that, you know, I mean, the no-action alternative is the status quo, and the status quo in this case, with respect to the Clean Water Act, is that those discharges, those operators could continue to discharge, presuming they had done the necessary NOI that would allow them to do so. So to their specific, Ms. Monceau's specific point, that you could have considered having limits on the types and quantities of discharges of wastewater and well treatment fluids, the answer to that would be that you considered the impact of incremental discharges of that sort and found that they would be negligible. Is that correct? That's correct. The EPA found that all of the discharges allowed under this general permit, due to the limitations that are imposed under the Clean Water Act, result in negligible discharges. That's specifically stated in the record of decision. Right. And I think that's one of the things here, is that, you know, petitioners kind of fail to acknowledge that EPA was undertaking this, you know, this related Clean Water Act action. They kind of want to split everything up, and I think you do need to take that into account, Your Honor. Some of the argument was made that the point of the permit is to allow the discharges. The point of the permit is to prevent unreasonable degradation to the marine environment. I mean, that's the standard. EPA's, you know, that's its obligation, and that's the standard it met here. Petitioners have argued that a couple other arguments they've made regarding alternatives is that you should have considered individual permits. I would just point the Court to EPA's regulations at 40 CFR 122.28C, which requires the regional administrators to issue general permits for these types of sources. It says they may issue separate general permits or individual permits when offshore areas include areas such as areas of biological concern for which separate permit conditions are required. The general permit here doesn't cover any of those areas, so it certainly wasn't unreasonable for EPA not to analyze individual permits. With respect to amounts of water, it would really be an unreasonable, impractical type of alternative or a condition here under the Clean Water Act because it would really be arbitrary. I mean, the problem is for these types of sources, there's so much variability in produced water between wells, and even in an existing well over the course of its life, that it's just very, very difficult to predict what that would be. In the Gulf like this, are they pumping fresh water, or are they taking water out of the Gulf and putting it down the well bore? I don't understand. Well, there may be, like, when the well is initially drilled, my understanding is there's going to be, and there would be, water to the extent that they're using frac packs, part of the fluids, the base of it's seawater, and that's discussed in the EIS. And so there is some water that might be injected to these wells, and there's well treatment fluids that would be injected. Right. Those are going to come up. They're going to be treated through the well water separation process. Right. But produced water, a lot of it, in my understanding, consists of water that's in the formation. And, in fact, that might increase over time. Like, at the end of a well's life, you might have- Well, that's going to be saltwater, too, right? It's going to be saltwater, but it can be pretty toxic, frankly. My understanding is the concentration in that type of water- Of the hydrocarbons. Is much, much higher, just in terms of salinity alone, much, much higher than seawater. So it's really, I mean, it is water that is a little different than just seawater, but it's water that's in the formation. So, Your Honor, I see I'm out of time, so I would ask that you, if you reach the merits, that you deny the petition for review and uphold the EPA's decision. Thank you. Okay, Ms. Rosenbaum. May it please the Court, the petitioners purport to establish standing without identifying a single point source, not a single point source, that they claim is the source of the injury, and without purporting to explain how close any of the activities are going to be to that point source. This falls woefully short of the standards established by this Court and the Supreme Court. Let me start by making clear that injury to the environment is not enough. The Supreme Court said that in Laidlaw, quote, the question is, quote, not injury to the environment, but to the plaintiff, end quote. So that was resolved in Laidlaw. And in two decisions, the Earth Island decision by the Supreme Court and this Court's decision in Crown Central, the Court's made perfectly clear that plaintiffs have to demonstrate they engage in activity with respect to the activity that they're challenging. In Earth Island, the challenge was to force service regulations with respect to timber salvage and fire rehabilitation. The plaintiffs, which were NGOs as they are here, had members who visited the National Forest. The Supreme Court found no standing. You have to show that you were going to be visiting the specific parcels directly affected by this policy. Standing denied. This Court in Crown Central actually addressed its prior decision in Cedar Point, which involved NPDES violations by an offshore oil and gas well. There were, in that case, an NGO with three members who purported standing. This was a well in Galveston Bay. Two of those members said, I fish, I swim there, I recreate there, I do bird watching, I canoe. But they never said they came close to the point source at issue. The Court denied standing. It's those two members. The third, in his affidavit, said, I do engage in those activities next to the point source. The Court said that was enough for there to be standing. But this Court made clear in Crown Central you had to show that kind of nexus. That has not been shown here. A critical point also is the nexus has to be with respect to a new point source, a new point source that will come into effect and be subject to this permit and not the prior permit. That's by statute. 33 U.S. Code 1371C1 says NEPA does not apply except with respect to new point sources. The administrator has no obligation to conduct anything with respect to such preexisting facilities. And the D.C. Circuit held that explicitly in NRDC v. EPA, 859F2-156 at page 167, where they said the issuance of discharge permits to new sources are the only actions taken by the administrator that will trigger a new NEPA duty. And the Clean Water Act is the same for the reasons that the government has already explained. In terms of proximity, you have to show real proximity. Now, there's no one size fits all. In Gulf Restoration, there was a plaintiff who explicitly said in his declaration that I was unable to swim in a particular place because there were tar balls there coming from the deep water horizon spill. Well, we didn't challenge standing. I was in that case. I argued that case. We didn't challenge standing because that was a specific allegation of specific harm from the specific activity that was at stake there. Here we have clear findings that 1,000 meters is the outside limit of the effect coming from a particular point source. And if you look at EISGMG468, that page number, you'll see that actually 1,000 meters is really in the shallowest areas, coastal areas. Here we're talking about the federal OCS, which is not that area. When you go out to shallow shelf waters, it's only 300 meters. If you go further out, it's less than that. And so 1,000 meters is incredibly generous. But where's a declaration that even claims 1,000 meters here? There's not. So it's just there is no basis for standing. All right. Thank you, sir. Ms. Munsell. Thank you, Your Honor. I just have a couple of quick points to make. One is with respect to the merits and the toxicity testing that's required somehow rectifying any errors on the part of EPA. I think that's just inaccurate. The toxicity testing of produce water is not required to be done in conjunction with a wells simulation event. So the toxicity testing won't reveal if there are toxic components to the wastewater as a result of a fracking event. And secondly is this idea I think that permeates a lot of EPA's arguments and their briefing is that we've been looking at this for years and years, but there's never been any impacts that we've found. But I think that just stems from the basic premise that you're not going to find impacts if you're not looking and EPA is not looking. It's relying on documents for the large part that were compiled in the early 90s when the amount of fracking and other well simulation events that were occurring was roughly 2.5% of wells undergo well simulation and 9% are acidized. But now we know that more than 65% of production wells undergo well simulation pursuant to... Is that an onshore and offshore statistic? This is offshore statistics. It's in BOEM's EIS at 178 to 179. So it's simply not true that this practice doesn't happen a lot. And even in the frack packs, the chemicals are still used and still discharged. So still a potentially significant impact on the environment that EPA has never adequately studied. And we're not asking that all discharges from all offshore oil and gas operations be halted. But what we are asking is that EPA does the review that's required under the National Environmental Policy Act and the Clean Water Act before allowing these incredibly dangerous chemicals be dumped into our ocean environment. And EPA also focused a bit on why the alternatives we suggested they do consider would be impracticable. But those are arguments they made separate and apart from a NEPA evaluation. That evaluation is supposed to be in the NEPA document itself so that the public can be informed and participate in agency decision making. Isn't it accurate that you made most of these points during the permitting process and that EPA responded to all of them? Yeah, but we did raise some of them. But the problem is that EPA responded just in response to comment document. It didn't go through the analysis in the NEPA evaluation itself, which it's supposed to do at the draft stage so that the public can comment as to why those assertions they're making are not accurate or aren't sufficient under the law. With respect to standing, we've talked a lot about that so far. One other case that I wanted to draw the court's attention to that we cited in our briefs was the Sierra Club v. Cedar Point oil case. There you had pollution going into Galveston Bay, which is also a large area. The court found standing there because the plaintiffs used the water body and found that the fact that there was a large number of discharges happening doesn't mean that the plaintiffs aren't injured by that discharge. Have you ever seen Galveston Bay? I have not, Your Honor. You can look from one side to the other. Yes, but I think the point there, though, is that the plaintiffs were using the water body at issue, just like Henderson uses the Gulf of Mexico, including in areas where there are currently offshore oil and gas platforms. Right. Well, thank you very much. We will take this carefully into consideration. The court will stand in recess for 10 minutes.